**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

MARIA R. GAMEZ,

        Plaintiff,

vs.                                                                No. CIV 04-719 JB/WCS

COUNTRY COTTAGE CARE & REHAB.,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Silverstone Healthcare of Hobbs,

L.L.C. d/b/a Country Cottage Care and Rehab.'s Motion for Summary Judgment and Memorandum

in Support of Motion for Summary Judgment, filed on January 14, 2005 (Docs. 22 & 23). The *pro*

*se* Plaintiff, Maria R. Gamez, did not file a response to the motion. The Court held a hearing on this

motion on February 18, 2005. Gamez did not appear in person or telephonically for the February

18th hearing. The Court took the motion under advisement and did not rule at that time. Gamez still

did not respond or attempt to contact the Court about this motion. The pretrial conference is set for

today, February 28, 2005; the Court therefore needs to rule on this pending motion. The Court, after

reviewing Silverstone's[1] briefing and relevant caselaw, concludes that Silverstone is entitled to

summary judgment on the federal claims. Having dismissed all claims on which the Court has original

jurisdiction,[2] the Court will remand all remaining claims -- all of which sound in state law -- to the

---

[1] Silverstone does not contend that, by bringing suit against Country Cottage, she sued the incorrect party.

[2] Silverstone has not asserted diversity jurisdiction, and in the Notice of Removal, relied upon federal question jurisdiction for removal. <u>See</u> Notice of Removal ¶ 4, at 2 (filed June 25, 2004)(Doc.

Fifth Judicial District, County of Lea, State of New Mexico.

<u>**FACTS**</u>[3]

1.      <u>**Reduction in Hours.**</u>

Country Cottage is a fifty-five bed nursing home located in Hobbs, New Mexico.  <u>See</u>

Operations Transfer Agreement, § I, at 1.  Since September, 1993, Gamez has worked at Country

Cottage as a housekeeper, <u>see</u> Deposition of Maria R. Gamez at 10:12-14; <u>id.</u> at 14:18-19 (taken

November 17, 2004)(hereinafter, "Gamez Depo."), in the maintenance department.[4]  Gamez is still

employed in this position.[5]  <u>See</u> Gamez Depo. at 10:12-14; Initial Pretrial Report ("IPTR"), ¶ 2, at

---

1)("Removal is appropriate under federal question jurisdiction, 28 U.S.C. § 1331, because Plaintiff alleges violation of the federal [Age Discrimination in Employment Act].").  Silverstone is incorporated under the laws of Delaware and has its principal place of business in New Mexico.  <u>See</u> Notice of Removal ¶ 3, at 1-2.  Under 28 U.S.C. § 1332(c), a corporation is a citizen of state where it is incorporated and where it has its principal place of business.  Gamez is a resident of New Mexico, <u>see</u> Complaint ¶ 2, at 1, and, thus, the Court does not have diversity jurisdiction.

[3] The Court will recite only the facts which pertain to the federal claims.

[4] The portion of Gamez' deposition to which Silverstone cites does not support the fact that, as a housekeeper, she worked for the maintenance department.  In White and Lozano's affidavits, they list housekeeping and maintenance as separate departments.  <u>See</u> Affidavit of Elizabeth White ¶ 2, at 1 (executed January 13, 2005)(hereinafter, "White Aff."); Affidavit of Manuel Lozano ¶ 3, at 1 (executed January 13, 2005)(hereinafter, "Lozano Aff.").  It is not clear from the evidentiary record before the Court, therefore, whether, as a housekeeper, Gamez worked in a separate department from maintenance.  In his affidavit, Lozano states that he is the director of the maintenance department and Gamez' supervisor, suggesting that housekeeping is part of the maintenance department.  <u>See</u> Lozano Aff. ¶ 1, at 1.  In any case, Silverstone listed this fact in its Statement of Undisputed Material Facts, and Gamez has not disputed this fact.  Under local rule 56.1, this fact is thus deemed undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.").

[5] On December 2, 2004, Country Cottage's housekeeping was contracted out to Summit Company.  Summit Company hired Gamez, and she continues to work her same schedule at Country Cottage.  Silverstone contends, however, that the contract with Summit has no effect on the disposition of this case.  <u>See</u> Motion for Summary Judgment at 2 n.1.

2, filed on August 4, 2004 (Doc. 8)("Stipulations").

At the time Gamez began working at Country Cottage, Silverstone alleges that Horizon Healthcare leased and operated the facility. See Gamez Depo. at 14:3-17; Affidavit of Ernest A. Schofield ¶ 2, at 1 (executed January 13, 2005)(hereinafter, "Schofield Aff."); Application for Employment at 1 (indicating Gamez applied to the Horizon Healthcare Corporation).[6] Silverstone contends that several different entities leased and operated Country Cottage during Gamez' employment. See Schofield Aff. ¶ 3, at 1. In January, 2003, BNMHC I, L.L.C. ("BNMHC") leased and operated Country Cottage. See id.[7]

In January, 2003, the number of patients at Country Cottage declined, causing revenues to decrease. See White Aff. ¶ 2, at 1; Lozano Aff. ¶ 3, at 1. Because of the decreased revenue, BNMHC management decided that it was necessary to reduce expenses, including payroll expenses that the housekeeping, maintenance, dietary, and nursing departments incurred. See White Aff. ¶ 2, at 1; Lozano Aff. ¶ 3, at 1. Thus, management reduced the number of hours allocated to

---

[6] Silverstone does not offer evidence from whom Horizon Healthcare leased Country Cottage in September, 1993.

[7] In the IPTR, when Gamez was still represented by counsel, the parties stipulated to the fact that BNMHC hired Gamez on September 8, 1993. Based on Gamez' application and deposition, and Schofield's affidavit, however, Silverstone has offered evidence that it was Horizon Healthcare -- not BNMHC -- which operated the facility at the time Gamez was hired. Moreover, Silverstone represents that several other entities leased and operated the facility during Gamez' employment at Country Cottage. In its undisputed material facts, Silverstone does not indicate when BNMHC began leasing and operating the facility. The Operations Transfer Agreement, however, indicates that BNMHC entered into a lease to operate the facility in June, 2000. The Court need not decide if this is the earliest date on which BNMHC operated the facility. The material fact for this motion's purposes is which corporate entity was Gamez' employer at the time she suffered the alleged adverse employment action. There is nothing in the record to dispute Silverstone's representation that in January and February, 2003 -- the date of the alleged adverse action -- BNMHC was the lessee and operator of Country Cottage.

housekeepers.[8]  See White Aff. ¶ 2, at 1; Lozano Aff. ¶ 3, at 1.

Gamez -- in January, 2003 -- was working an average of twenty-eight hours per week[9] -- six

hour shifts of four days on and two days off.  See White Aff. ¶ 4, at 1-2; Lozano Aff. ¶ 4, at 1-2;

Payroll Records of Rosa Gamez at 1 ("Payroll Records").[10]  On February 9, 2003, management

reduced her shifts to five hour shifts, but the number of days Gamez worked remained the same.  See

_____

[8] During oral argument on this motion, counsel for Silverstone, Carol Dominguez Shay, represented to the Court that hours were cut from the dietary, maintenance, and nursing departments as well as the housekeeping department.  See Transcript of Hearing at 11:21-25 (taken February 18, 2005).  To support this contention, Silverstone offered White's and Lozano's affidavits indicating that the maintenance, dietary, nursing and housekeeping payroll expenses needed to be reduced.  The affidavit, however, does not indicate whether Country Cottage reduced other employees' hours and, if so, by how much.  The only evidence in the record discussing whether Country Cottage reduced employees' hours in other departments occurred during Gamez' deposition, in which she was asked whether she was aware that dietary staff hours were reduced as well, and Gamez responded that, according to one of the dishwashers, the dietary workers' hours were not cut.  See Gamez Depo. at 50:21 - 51:2.  Moreover, Silverstone offers the undisputed fact that nursing staff hours can only be reduced to a certain level because of Medicare regulations which require that the facility have a minimum number of nursing hours per day.  See White Aff. ¶ 3, at 1.  Silverstone does not offer sworn evidence indicating how much nursing hours were reduced.  Again, however, Gamez does not dispute these alleged undisputed facts, which under the local rules, are deemed admitted.  See D.N.M.LR-Civ. 56.1(b).

The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

[9] The average hours per week when working six hour shifts on a four day on two day off schedule is 28.8 hours.

[10] The parties stipulated that the payroll records accurately reflect the date that the management reduced Gamez' hours.  See Gamez' Depo. at 38:3-6.  The parties entered into this stipulation while counsel represented Gamez.  Also, in her deposition, Gamez was asked: "If the records show that it was January of 2003, would you agree with that?"  Id. at 37:3-4.  Gamez replied: "Well, the records are the truth.  Everything is written down on them."  Id. at 37:5-6.  Gamez thus does not dispute the payroll records' accuracy.  The Court also notes that the payroll records are in the name of "Rosa Gamez," but the named plaintiff is "Maria R. Gamez."  In her application for employment, Gamez indicated that her middle name is "Rosa," so the Court will assume that the payroll records are those of the plaintiff, Maria R. Gamez.

White Aff. ¶ 5, at 2; Lozano Aff. ¶ 5, at 2; Payroll Records at 2-3.  Thus, management reduced her average hours per week from twenty-eight hours per week to twenty-four hours per week.  <u>See</u> White Aff. ¶ 5, at 2; Lozano Aff. ¶ 5, at 2; Payroll Records at 1-3.

At that time, Country Cottage employed two other housekeepers, and each of the other two housekeepers worked the same number of hours per week as Gamez.  <u>See</u> White Aff. ¶ 4, at 1-2; Lozano Aff. ¶ 4, at 1-2.   Management reduced the other housekeepers' hours the same amount it had reduced Gamez's hours.  <u>See</u> White Aff. ¶ 5, at 2; Lozano Aff. ¶ 5, at 2.  BNMHC did not hire additional employees to assume these reduced hours.  <u>See</u> White Aff. ¶ 5, at 2; Lozano Aff. ¶ 5, at 2.  Manuel Lozano, Gamez' supervisor and the person in charge of the housekeepers' schedules,  <u>see</u> Lozano Aff. ¶¶ 2, 4, at 1-2; Gamez Depo. at 9:1-2;  <u>id.</u>  at 15:7-23, explained to Gamez that the reason management was reducing her hours was because there were fewer residents in the facility. <u>See</u> Lozano Aff. ¶ 5, at 2; Gamez Depo. at 50:10-13.

Silverstone alleges that BNMHC's group health care plan, Ballantrae Healthcare, L.L.C., defined an employee as "[a] regularly assigned, full-time Employee of the Company scheduled to work 32 or more hours per week."[11]  Ballantrae Healthcare, L.L.C. Summary Plan Description at 29 (effective March 1, 2003).   The Ballantrae Healthcare plan that BNMHC offered, however, is effective March 1, 2003; there is no evidence in the record indicating the health care benefit plan

---

[11] Silverstone describes Ballantrae Healthcare as the group health care plan that BNMHC offered, but the portion of the record to which Silverstone cites in its motion does not support this conclusion.  <u>See</u> Motion for Summary Judgment ¶ 8, at 4.  Moreover, as Silverstone notes, the Ballantrae Healthcare plan provided in the record was effective March 1, 2003.  <u>See</u> <u>id.</u>; Ballantrae Healthcare Summary Plan Description at 1.  There is nothing in the record, however, indicating which group health care plan was in effect on the date that management reduced Gamez' hours, and whether such a plan contained a similar definition of an employee.  Again, however, Gamez does not dispute this statement of undisputed material fact in Silverstone's motion, and, under the local rules, it is deemed admitted.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

available on or before February, 2003.

### 2. Successor Liability.

On August 1, 2003, Silverstone began leasing and operating Country Cottage from BNMHC. See Schofield Aff. ¶ 4, at 1; Operations Transfer Agreement, Art. 1, § 1.1, at 1.[12]  On that same date, Silverstone entered into a contract with Peak Medical NM Management Services ("Peak Management") whereby Peak Management would provide facility management services to Silverstone for Country Cottage's operation.  See Schofield Aff. ¶ 4, at 1-2.  Thus, in August, 2003, Silverstone became Gamez' employer.  See IPTR ¶ 2, at 2 ("Stipulations").

The transfer agreement between Silverstone and BNMHC includes a contract provision which states that Silverstone does not assume BNMHC's preexisting liabilities.  See Operations Transfer Agreement, Art. 2, § 2.18, at 6; Schofield Aff. ¶ 6, at 2.  The transfer agreement provides: "Other than as specifically set forth herein, [Silverstone] shall not assume and shall not be liable for any debts, liabilities or obligations of [BNMHC] including, but not limited to, any . . . (b) liabilities or obligations of [BNMHC] with respect to any acts, events or transactions occurring prior to, on or after the Closing Date."  Operations Transfer Agreement, § 2.18, at 6.  Silverstone contends that neither Peak Management nor its parent company, Peak Medical Corporation ("Peak Medical"), assumed liability for any of BNMHC's acts or omissions.  See Schofield Aff. ¶ 6, at 2.  When Silverstone began operating Country Cottage on August 1, 2003, neither Silverstone or Peak Management had knowledge of Gamez' EEOC Charge against Country Cottage for discrimination or of Gamez' potential claim against Country Cottage for breach of contract.  See id. ¶ 5, at 2.

---

[12] The Operations Transfer Agreement indicates that the owner of the facility is Hobbs Associates, L.L.C., an Illinois limited liability company.  See Operations Transfer Agreement § I, at 2.

Silverstone, when it began operating Country Cottage in August, 2003, increased each of the housekeepers' -- including Gamez' -- hours.  See Gamez Depo. at 18:20 - 19:11; White Aff. ¶ 6, at 2; Lozano Aff. ¶ 6, at 2; Payroll Records at 4.  Silverstone increased Gamez' hours from an average of twenty-four hours per week to an average of approximately twenty-eight hours per week.   See Gamez Depo. at 19:9-11; White Aff. ¶ 6, at 2; Lozano Aff. ¶ 6, at 2; Payroll Records at 4.

Silverstone's Healthcare Benefit Plan, which went into effect August 1, 2003, states that, to be eligible for the plan, the employee must be "regularly scheduled to work at least 30 hours per week[.]" Silverstone Healthcare, Inc. Benefit Plan, Plan Document, at 2 (effective August 1, 2003).[13] In her deposition, Gamez was shown this excerpt from Silverstone's benefit plan, and then asked if she worked thirty hours a week, to which she responded that she did not.  See Gamez Depo. at 32:11-16.

### 3.   Age, Race, and National Origin Discrimination.

Gamez is originally from Mexico, but is a resident alien in the United States.  See Gamez Depo. at 16:5-10.  At the time of her deposition, in November, 2004, Gamez was fifty-nine years old. See id. at 9:10-11.

The Silverstone Employee Handbook states: "This Handbook and any Handbook

---

[13] In her Equal Employment Opportunity Commission ("EEOC") Charge and in her deposition, Gamez alleges that Country Cottage deducted heath care insurance premiums even though she was not insured.  See EEOC Charge at 1; Gamez Depo. at 44:11-18.  In her deposition, Gamez testified that "they" would take "49 and change" out of every check, and that she was not refunded for the amounts deducted.  Gamez Depo. at 44:14-18.  In her Complaint, Gamez alleges that the deductions occurred from February, 2003, to November, 2003.  See Complaint ¶ 5, at 2. There is no evidence in the record to support the dates during which time the premiums were allegedly deducted, and the IPTR does not mention these deductions.  At most, it would suggest a claim for breach of contract.  Because the Court is remanding all state claims, the Court does not resolve any claim based on the premiums.  Even if established, however, this allegation does not support Gamez' claim of age or gender discrimination.

Supplements are not an employment contract and are not intended to guarantee . . . any specific terms or benefits of employment. . . .  No member of the Company's management staff has the authority to make oral or written promises of employment that are inconsistent with the policy of at-will employment."  Silverstone Healthcare Employee Handbook at 1 (effective September 1, 2003).  The Handbook also states that the employee's "work schedule generally will be determined by [the employee's] supervisor or Department Head."  Id. at 11.  Gamez has no reason to believe that anyone other than Lozano determines her work schedule.[14]  See Gamez Depo. at 30:20-22.  Lozano is Hispanic and over forty-years old.  See Lozano Aff. ¶ 2, at 1.  Gamez conceded that Lozano is not prejudiced against Hispanics or older people.  See Gamez Depo. at 30:23 - 31:2.

Gamez alleges that, in 2000, when Gamez told a supervisor, "Tammy,"[15] that a buffer was broken, Tammy said: "Shut your mouth, do your work, or else I'm going to call immigration to come get you."  Id. at 19:25 - 20:8.  Gamez reported this comment to the administrator, Antonieta

---

[14] In her deposition, Gamez testified that sometimes another person -- named "Davey" -- in the office is responsible for setting her schedule.  Gamez Depo. at 29:20- 30:1.  When asked how Gamez knew Davey was responsible for setting her schedule, Gamez testified that it was because Davey distributed the checks and because Davey could answer questions about vacation time.  See id. at 30:15-19.  Gamez, however, conceded that all schedules bore Lozano's signature, and then stated, "so I don't know."  Id. at 30:18-19.  Gamez was then asked: "So for all you know, Mr. Lozano is the only one that sets your schedule?", to which Gamez replied, "Yes."  Id. at 30:20-22.

Silverstone also included among its undisputed material facts: Lozano was responsible for allocating the hours between the three housekeepers.  See Motion for Summary Judgment ¶ 18, at 6.  The record, however, states only that Lozano was responsible for scheduling the days the housekeepers were to work, not that he was responsible for allocating the hours between the housekeepers.  See White Aff. ¶¶ 2, 4, at 1-2; Lozano Aff. ¶ 4, at 1-2.  The record does state, however, that all housekeepers had the same amount of hours.  In any case, Gamez does not dispute this alleged statement of an undisputed fact, and under the Court's local rules, this statement is deemed admitted.  See D.N.M.LR-Civ. 56.1(b).

[15] Gamez testified that she did not know Tammy's last name.  See Gamez Depo. at 19:25.

Sanchez.  See id. at 20:9-12.  In response, Sanchez held a meeting with Tammy, Gamez, and one of

the residents.  See id. at 20:14-17.  According to Gamez, Tammy said "that she would never tell

[Gamez] that again."  Id. at 20:18-20.  Gamez also testified that another incident occurred in which

Tammy said to Gamez: "I'm sorry, but you speak really bad English."  Id. at 21:1-2.[16]  Gamez,

however, admitted that Tammy is not responsible for scheduling her hours.  See id. at 42:15-16.

Gamez also conceded that Tammy left the company in 2002.  See id. at 42:19-20.  When asked if

there was any other evidence other than these conversations that Gamez had to support her claim of

discrimination based on her language or her national origin, Gamez responded that there was

"[n]othing else."  Id. at 43:10-14.

When asked whether Gamez had any evidence that Country Cottage cut her hours because

of her age, the following exchange occurred:

> A.  They cut back my hours because I don't speak English and because I never make
> [sic] a claim for my rights.  This is the first time I have asserted my rights.  Or maybe
> it's because of my age.
>
> Q.  (BY MS. DOMINGUEZ SHAY) Do you have any evidence or proof that it's
> because of your age?
>
> A.  Because of my age, no.  Because of my language, yes.
>
> Q.  What is your proof that it's because of your language?
>
> A.  Because if I would have spoke -- if I would have spoken English, my supervisor,
> Tammy, would have never told me, that she was sorry, but that I didn't speak English
> well.  And that's why I say that it's because of the language.
>
> * * * *
>
> Q.  So the real problem is not your age, it's your language?

---

[16] Gamez did not indicate on which date this second alleged incident occurred.

-9-

A. My origin and my language.

Q. But not your age?

A. No. It's my origin and my language that made them treat me that way, or that led them to treat me that way.

Gamez Depo. at 41:25 - 42:14; id. at 46:8-14. Gamez also admitted that no members of Country Cottage's management had verbally harassed her because of her age. See id. at 43:7-9.

## PROCEDURAL BACKGROUND

On or about May 19, 2003, Gamez filed a Charge of Discrimination with the EEOC, alleging that she "ha[s] been discriminated against in the form of verbal harassment and having insurance premiums deducted from my salary but not being insured which I believe is in violation of the Age Discrimination in Employment Act ["ADEA"] of 1967 and Title VII of the Civil Rights Act of 1964 . . . ." EEOC Charge of Discrimination at 1 (filed May 22, 2003). The Charge also describes the alleged discrimination as based on age and national origin.[17] See id.

Gamez filed her lawsuit in the Fifth Judicial District, Lea County, New Mexico on May 3, 2004 (CV-2004-196C). On June 25, 2004, Silverstone removed the case to the United States District Court for the District of New Mexico under 28 U.S.C. §§ 1441 and 1446. See Notice of Removal, at 1. The Complaint alleges violations of the "Age Discrimination in Employment Act . . . , 29 U.S.C.

_____

[17] On February 3, 2004, the EEOC issued a Dismissal and Notice of Rights, which indicated that the "EEOC was unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes." EEOC Dismissal and Notice of Rights at 1 (dated February 3, 2004). The Notice also states that Gamez has ninety days from the receipt of the notice to file suit under federal law in state or federal court. See id. Because Gamez brought her original lawsuit on May 3, 2004, it is timely. Silverstone does not contest the timeliness of the federal claims, but alleges that Gamez brought her state law claims under the New Mexico Human Rights Act (NMHRA) after the thirty day period that the state statute provides. See Motion for Summary Judgment at 19-20. The Court, however, will not address the merits that claim, because the Court is remanding all claims based on state law.

-10-

§621-624, the New Mexico Human Rights Act, §28-1-1 through 28-1-14 NMSA (1978 Comp.), and the Constitution and Laws of New Mexico, inter alia."[18]  In the IPTR, however, Gamez "contends that she had her hours reduced because of her age and because she primarily speaks Spanish because she is Hispanic."  IPTR at 2 (emphasis added).  Gamez also included an exception, stating: "Plaintiff does not agree that this case is only an age discrimination case as the administrative proceedings also addressed the fact that Ms. Gamez is Hispanic and she contended that she was discriminated against because she is Hispanic."  Id. at 9.  The IPTR indicates that Gamez intended to file a first amended complaint.  See IPTR at 2.  Gamez, however, did not, through her counsel or while proceeding *pro se*, attempt to file an amended complaint.

Gamez seeks various relief from the Court, including that the Court: (i) declare that Country Cottage has violated her rights; (ii) enjoin Country Cottage from engaging in such conduct; and (iii) order Country Cottage "to place [Gamez] in a comparable position to that of eight hours a day, at a salary comparable to those positions, or in the alternative, order [Gamez] to be paid the difference of her current salary and that of these positions until [Gamez'] normal retirement age;" (iv) award Gamez compensatory damages for emotional distress, loss of self-esteem, and injury to reputation; (v) grant Gamez' attorney's fees; and (vi) grant Gamez further damages as the Court deems proper. Complaint ¶¶ A-F, at 3.

At the time of filing her complaint and during her deposition, Kevin J. Hanratty represented Gamez.  On December 13, 2004, however, Mr. Hanratty filed a motion to withdraw.  See Doc. 17. The Court held a hearing on that motion December 29, 2004, and entered a Memorandum Opinion

---

[18] The Complaint does not allege unlawful race discrimination in violation of Title VII, and it also does not state that Gamez is originally from Mexico and is Hispanic.

and Order, granting the motion.  See Memorandum Opinion and Order, filed January 7, 2005 (Doc. 20).  The Court provided Gamez ten days from the date of the hearing to obtain new counsel or otherwise she would be deemed to be representing herself *pro se*.  See id. at 3.

At the time the Court held the hearing on this motion on February 18, 2005, Gamez had not indicated to the Court that she had retained other counsel, and no counsel had made an appearance on her behalf.  The Court will assume, therefore, that Gamez proceeds *pro se*.

On January 14, 2005, Silverstone filed a Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment, and mailed of copy of the documents to Gamez at her address of record with the Court.  Plaintiff did not file a response to Silverstone's motion.  On February 10, 2005, Silverstone sent Gamez a letter by United Parcel Service overnight mail and by United States certified mail, return receipt requested.  See Affidavit of Carol Dominguez Shay ¶ 7, at 2 (executed February 15, 2005)(hereinafter, "Shay Aff.").  The letter -- which was sent in both English and Spanish -- indicates that Silverstone had filed a motion for summary judgment, and that it is Gamez' best interest to file a response to the motion and appear at the February 18, 2005 hearing.  See Letter from Duane C. Gilkey to Maria R. Gamez at 1 (dated February 10, 2005).  On February 14, 2005, Silverstone hand delivered copies of the February 10th letter, along with additional copies of the motion for summary judgment, to Gamez' work address.  On the evening of February 14, 2005, Gamez responded to Silverstone in a facsimile letter.  See Shay Aff. ¶ 8, at 1.  The letter, which is written in English, states that she is not able to make the February 18th hearing and that she "do[es] not have [her] case in order nor the proper representation at this time."  Letter from Maria R. Gamez to Whom It May Concern at 1 (dated February 14, 2005).  The letter also states that "this is the first time that I have received a letter in my language.  I don't speak nor write English

fluently and would like that all documents that pertain to this case be in Spanish."  Id.

## LAW REGARDING SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment if a party is entitled to judgment as a matter of law and there are no genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To avoid summary judgment, the non-moving party must contradict facts that the movant specifically avers.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).

The moving party bears the initial burden of establishing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. at 323.  The moving party can meet the burden by highlighting for the court an insufficiency of evidence as to an essential element of the nonmovant's claim.  See id.  Once met, the burden shifts to the nonmoving party to present specific, admissible facts from which a rational trier of fact could find for the nonmovant.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. at 324).  The non-moving party may not rest on his pleadings, but must set forth specific facts.  See Applied Genetics Int'l v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   Under rule 56(e), only statements made with actual knowledge will support or counter a motion for summary judgment; the court must disregard statements of mere belief.  See Tavery v. United States, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994).  "A plaintiff cannot create a triable issue of fact by making an assertion without supporting facts."  Kelley v. Goodyear Tire & Rubber Co., 220 F.3d 1174, 1177 (10th Cir. 2000).

For the purposes of summary judgment, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most

favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). If "the evidence, interpreted favorably to the plaintiff, could persuade a reasonable jury that the employer had discriminated against the plaintiff[,]" the court should deny summary judgment. MacDonald v. E. Wyoming Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991)(quoting Palucki v. Sears, Robueck & Co., 879 F.2d 1568, 1570 (7th Cir. 1989)).

The court should, however, grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. A "genuine" factual dispute requires the non-moving party to show more than a mere "scintilla of evidence" to overcome a motion for summary judgment. Id. at 252.

The court may grant summary judgment if the non-moving party's evidence is merely colorable or is not significantly probative. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

Under local civil rule 7.1(b) for the District of New Mexico, "[t]he failure of a party to file

and serve a response in opposition to a motion within the time prescribed for doing so constitutes

consent to grant the motion."   D.N.M.LR-Civ. 7.1(b).   Moreover, under local rule 56.1(b), on a

summary judgment motion: "All material facts set forth in the statement of the movant will be deemed

admitted unless specifically controverted."   D.N.M.LR-Civ. 56.1(b).   If the nonmoving party fails to

comply with the procedural rules by not responding within the time allowed, the party "waive[s] the

right to file a response and confesses all facts asserted and properly supported in the motion."

Murray v. City of Tahlequah, 312 F.3d 1196, 1199 (10th Cir. 2002).   The court may not, however,

grant

> summary judgment . . . merely because [the nonmoving party] failed to file a response.
> Before the burden shifts to the nonmoving party to demonstrate a genuine issue, the
> moving party must meet its "initial responsibility" of demonstrating that no genuine
> issue of material fact exists and that it is entitled to summary judgment as a matter of
> law.   [Celotex Corp. v. Catrett, 477 U.S. at 322-23].
>
> * * * *
>
> As explained by the Supreme Court in Adickes v. S.H. Kress & Co., 398 U.S. 144,
> 160-61 . . . (1970), the burden on the nonmovant to respond arises only if the
> summary judgment motion is properly "supported" as required by Rule 56(c).
> Accordingly, summary judgment is "appropriate" under Rule 56(e) only when the
> moving party has met its initial burden of production under Rule 56(c).   If the
> evidence produced in support of the summary judgment motion does not meet this
> burden, "summary judgment must be denied *even if no opposing evidentiary matter
> is presented*."   Id. at 160 . . . (quoting Fed. R. Civ. P. 56 advisory committee notes
> to the 1963 amendments) (emphasis added).   If the nonmoving party fails to respond,
> the district court may not grant the motion without first examining the moving party's
> submission to determine if it has met its initial burden of demonstrating that no
> material issues of fact remain for trial and the moving party is entitled to judgment as
> a matter of law. If it has not, summary judgment is not appropriate, for "[n]o defense
> to an insufficient showing is required."   Id. at 161 . . . .

Id. at 1199-1200.

## LAW ON SUCCESSOR LIABILITY

Generally, "where one corporation sells its assets to another corporation, the latter is not liable for the former's debts unless the transaction fits within well-defined exceptions." Trujillo v. Longhorn Mfg. Co., 694 F.2d 221, 224 (10th Cir. 1982).  These exceptions include: (i) when there is an express or implied assumption of liability; (ii) when the transaction results in a consolidation or merger of two corporations; (iii) when the purchaser is a mere continuation of the seller; and (iv) when the transfer is for the fraudulent purpose of escaping liability.  See id.; Scott v. Sopris Imps. Ltd., 962 F. Supp. 1356, 1358 (D. Colo. 1997).

To determine whether a purchaser company is a mere continuation of the predecessor company such that successor liability may be imposed, the United States Court of Appeals for the Tenth Circuit, in Trujillo v. Longhorn Manufacturing Co., 694 F.2d at 224-225, adopted a nine-factor test from the United States Court of Appeals for the Sixth Circuit's decision in EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1094 (6th Cir. 1974).  The nine "MacMillan factors" are:

> 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment, and methods of production and 9) whether he produces the same product.

Trujillo v. Longhorn Mfg. Co., 694 F.2d at 224-225 n.3 (quoting EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d at 1094).  See EEOC v. G-K-G, Inc., 39 F.3d 740, 748 (7th Cir. 1994)(noting that, "when a claim arising from a violation of federal rights is involved, the courts allow the plaintiff to go against the purchaser of the violator's business even if it is a true sale and not a

reorganization, provided that" the requisite conditions are satisfied)(Posner, C.J.).[19]  The Tenth

Circuit noted, however, "that the 'nature and extent of [successor] liability is subject to no formula,

but must be determined upon the facts and circumstances of each case.'"  Trujillo v. Longhorn Mfg.

Co., 694 F.2d at 225 (quoting EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d at 1092).

Federal courts, such as the United States Court of Appeals for the Seventh Circuit, often

apply a three-factor test which refines the MacMillan factors: "(1) whether the successor employer

had prior notice of the claim against the predecessor; (2) whether the predecessor is able, or was able

prior to the purchase, to provide the relief requested; and (3) whether there has been a sufficient

continuity in the business operations of the predecessor and successor."  Wheeler v. Snyder Buick,

Inc., 794 F.2d 1228, 1236 (7th Cir. 1986).  See Criswell v. Delta Air Lines, Inc., 868 F.2d 1093,

1094 (9th Cir. 1989)(applying the same three-factor test); Walker v. Faith Techs., Inc., 344 F. Supp.

2d 1261, 1267 (D. Kan. 2004)(applying the refined three-factor test); Jackson v. Lockie Corp., 108

F. Supp. 2d 1164, 1167 (D. Colo. 2000)(same); Scott v. Sopris Imps. Ltd., 962 F. Supp. 1356, 1358

(D. Colo. 1997)(same).  The third factor incorporates the six remaining MacMillan factors to

determine whether sufficient continuity exists.  See Wheeler v. Snyder Buick, Inc., 794 F.2d at 1236

---

[19] In EEOC v. G-K-G, Inc., the Honorable Richard A. Posner, then Chief Circuit Judge, sets forth two conditions that must be satisfied for successor liability to arise out of a federal rights violation claim: notice and substantial continuity.  See 39 F.3d at 747-48.  Even though Judge Posner does not enumerate the predecessor's ability to provide full relief as a requisite condition, in his discussion of "[t]he reason for this special federal common law doctrine of successor liability," Judge Posner discusses the applicability of successor liability depending on the relief sought.  Id. at 748.  Moreover, Judge Posner also noted that the predecessor company "has promised to indemnify [the successor company] for any liability that [the successor company] may be determined to have to [the plaintiff] and, more to the point, has retained sufficient assets to satisfy [the plaintiff's] judgment in full."  Id. at 747.  Thus, even though the ability of the predecessor to pay is not listed as a requisite condition to successor liability, Judge Posner considered it to some extent when analyzing if successor liability was appropriate in that particular context.

n.7 (describing the third factor as "an amalgamation of a number of indicia of continuity set forth in *MacMillan*.").

The Seventh Circuit and the Ninth Circuit have emphasized the notice and the ability of the predecessor to provide relief factors because -- as an equitable doctrine, see Criswell v. Delta Air Lines, Inc., 868 F.2d at 1094 -- these two factors are "'critical' because of the inequity of holding a successor liable when 'the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price[,]'" Wheeler v. Snyder Buick, Inc., 794 F.2d at 1236 (quoting Musikiwamba v. ESSI, Inc., 760 F.2d 740, 750 (7th Cir.1985)).  See Musikiwamba v. ESSI, Inc., 760 F.2d at 750.[20]  In terms of notice, the Tenth Circuit, in Trujillo v. Longhorn Manufacturing Co., held that imposing successor liability would not impose an undue hardship on the company, noting that the successor company "had notice of the EEOC complaint and could have provided for its nonliability or indemnification in the sale agreement." Trujillo v. Longhorn Mfg. Co., 694 F.2d at 225.

The Tenth Circuit, in evaluating the predecessors ability to provide relief, held that providing the purchase price and payment scheme at trial was insufficient to establish the predecessor company's ability to provide relief.  See id. at 225 (noting that "no current financial statement of the predecessor corporation was tendered at trial"); Walker v. Faith Techs., Inc., 344 F. Supp. 2d at

---

[20]  In concluding that the first two factors are the most important, the Seventh Circuit explained that "[t]he successor doctrine is derived from equitable principles, and it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price." Musikiwamba v. ESSI, Inc., 760 F.2d at 750.

1269-70 (holding that there was a genuine issue of material fact on the predecessor's ability to provide relief when the successor company offered evidence of a large payment to the predecessor company and the plaintiff, in response, presented evidence that the predecessor company had filed for bankruptcy and is "no longer in business"); Jackson v. Lockie Corp., 108 F. Supp. 2d at 1168 (noting that the plaintiff, on the defendant's summary judgment motion on successor liability, had not "presented any evidence suggesting that [the predecessor company], had she pursued her claims against it, would not have been able to provide full relief")(footnote omitted).  Courts also look at the type of relief sought when considering whether the predecessor company can provide full relief. Wheeler v. Snyder Buick, Inc., 794 F.2d at 1236-37 (noting that the predecessor company was unable to reinstate the plaintiff, but in concluding that successor liability was not appropriate, explaining that "substantial, while not complete, relief . . . is available to the victim," as well as that there was no actual knowledge of the claim and "the ownership of the predecessor and of the successor is totally distinct"); Jackson v. Lockie Corp., 108 F. Supp. 2d at 1168 (noting that "[t]he plaintiff is not seeking reinstatement or injunctive relief").  But see EEOC v. G-K-G, Inc., 39 F.3d at 748 (noting that, even though the plaintiff was only seeking monetary relief, the doctrine of successor liability still applies).

The Seventh Circuit also explained, however, that "[t]he remaining factor, the degree of continuity between the two enterprises, can be viewed as a variant of the 'continuity' exception to the general common law rule that 'a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities.'"  Wheeler v. Snyder Buick, Inc., 794 F.2d at 1236 (quoting Travis v. Harris Corp., 565 F.2d 443, 446 (7th Cir.1977)).  In Musikiwamba v. ESSI, Inc., the Seventh Circuit explained that the continuity

factor was first developed in actions to compel a successor to recognize and bargain

-19-

with the incumbent union.  It was relevant because the particular statutory right at issue was the employees' right to have the same union represent them. . . .

This rationale does not apply with equal force in the employment discrimination context.  The purpose of requiring a successor to remedy a predecessor's discrimination is not to leave the employees free to exercise discretionary rights but to protect the statutory purpose of nondiscrimination, which inheres to all employees as a matter of right.  Thus, the amount of "continuity" required between the predecessor and the successor will vary depending upon the number of employees adversely affected by the predecessor's action and the remedy requested by the injured employee(s).  In the instant case, for example, less continuity is required because the plaintiff is not seeking reinstatement, retroactive seniority, or placement on a preferential hiring list.  Greater continuity would be required if the plaintiff were seeking more than monetary relief.  And perhaps no amount of continuity would suffice to impose liability on a successor when a predecessor has discriminated against an entire class of individuals and the remedy is some sort of affirmative action decree or injunctive relief.  In all of these cases, however, enough continuity between the predecessor and successor must exist so that it can fairly be inferred that the successor and predecessor reasonably expected that the successor would be bound.

Musikiwamba v. ESSI, Inc., 760 F.2d at 751 (quotations and citations omitted).

In applying successor liability in the Title VII context, the Tenth Circuit explained that the

Sixth Circuit in EEOC v. MacMillan Bloedel Containers, Inc.,

surveyed the development of the successor employer doctrine in the labor law context and decided that the same policy considerations mandated the application of the doctrine to remedy practices violating Title VII.  [EEOC v.] MacMillan [Bloedel Containers, Inc.], 503 F.2d at 1090.  The Sixth Circuit noted that Title VII was largely modelled [sic] on the National Labor Relations Act, 29 U.S.C. § 151 et seq., where the successor employer doctrine originally developed.  Id. at 1091.  Furthermore the court noted that the Senate-House Conference Report on Title VII expressed the legislative intention that the courts use wide discretion in exercising equitable powers with the goal of fashioning the most complete relief possible.  Id.

Trujillo v. Longhorn Mfg. Co., 694 F.2d at 224-25.  As the Seventh Circuit explained: "When a claim

involves federal rights such as those enumerated by Title VII and § 1981[,] the federal common law

doctrine of successor liability governs."  Reed v. Lawrence Chevrolet, Inc., 14 Fed. Appx. 679, 687

(7th Cir. 2001)(unpublished decision)(citing EEOC v. G-K-G, Inc., 39 F.3d at 747-48; Wheeler v.

Snyder Buick, Inc., 794 F.2d at 1235-36).  The Tenth Circuit has not yet applied the successor liability doctrine in the ADEA context; however, then-Chief Judge Posner, in EEOC v. G-K-G, Inc. did so without discussion.  See 39 F.3d at 747-48.  See also Criswell v. Delta Air Lines, 868 F.2d at 1094-95 (applying successor liability to an injunction issued to the predecessor corporation for violation of the ADEA).

## LAW ON THE AGE DISCRIMINATION IN EMPLOYMENT ACT

**1.  McDonnell Douglas Analysis.**

The plaintiff bears the burden of proving discrimination.   In the absence of direct evidence, claims of age, race, national origin, gender discrimination, and retaliation are all subject to the burden shifting framework that the Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U. S. 792, 802-804 (1973). See Pastran v. K-Mart Corp., 210 F. 3d 1201, 1205 (10th Cir. 2000)(noting that retaliation claims are subject to the burden shifting analysis under McDonnell Douglas); Munoz v. St. Mary-Corwin Hosp., 221 F. 3d 1160, 1165-67 (10th Cir. 2000)( holding that a court must analyze claims of age discrimination under the ADEA and discrimination under Title VII under the analysis that the Supreme Court established in McDonnell Douglas).  Where the plaintiff is proceeding under McDonnell Douglas Corp. v. Green, the plaintiff must first set forth a prima facie case of discrimination.  See Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); English v. Colo. Dep't of Corr., 248 F.3d 1002, 1008 (10th Cir. 2001)("[A] plaintiff relying on *McDonnell Douglas* bears an initial burden of establishing a prima facie case intended to eliminate the most common nondiscriminatory reasons that might account for the adverse employment action.").

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to come

forward with a legitimate nondiscriminatory reason for its employment-related decision.  See McDonnell Douglas Corp. v. Green, 411 U.S. at 802.  Upon the employer's articulation of legitimate, nondiscriminatory reasons, the presumption of discrimination established by the prima facie case "simply drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).  To withstand summary judgment, a plaintiff must "present[] evidence that the defendant's proferred reason for the employment decision was pretextual-i.e. unworthy of belief."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)(quotation omitted).[21]  "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)(quoting Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996))(quotation marks omitted).  "To avoid summary judgment, a party must produce *specific* facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed.  Thus, plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."  Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988)(internal citations and quotations omitted)(alteration in the original).

_____

[21] The plaintiff does not -- at the summary judgment stage of the proceedings -- need to show that the actual or real reason for the unlawful action was discriminatory; instead, the plaintiff need only establish that  the defendant's proferred reasons are false or unworthy of belief.  If the case progresses to a trial on the merits, however, "the sequential analytical model adopted from McDonnell Douglas . . . drops out and [the court is] left with the single overarching issue whether [the] plaintiff adduced sufficient evidence to warrant a jury's determination [of unlawful discrimination]."  Fallis v. Kerr-McGee Corp., 944 F.2d 743, 744 (10th Cir. 1991)(citation omitted).

2.      **Age Discrimination Under the ADEA.**

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U. S. C. § 623(a)(1).  To establish a prima facie case of age discrimination, the plaintiff must show that: (i) she is within the protected age group; (ii) she was doing satisfactory work; (iii) she suffered some adverse employment action; and (iv) a younger person replaced her.  See Miller v. Eby Realty Group, L.L.C., 396 F.3d 1105, 1111 (10th Cir. 2005)(citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000)).[22]

---

[22] In its motion, Silverstone incorporated the prima facie case set forth in English v. Colorado Department of Corrections, 248 F.3d at 1008, and Kendrick v. Penske Transportation Services, 220 F.3d 1220, 1229 (10th Cir. 2000), and, by analogy, applied it to Gamez' ADEA claim based on the reduction of work hours.  In Kendrick v. Penske Transp. Servs., the Tenth Circuit expressly rejected the contention that, as part of the fourth prong of the discriminatory discharge prima facie analysis, the plaintiff must show "that the replacement employee was a member of the nonprotected class."  220 F.3d at 1227.  The Tenth Circuit concluded that the fourth prong only required the plaintiff to establish that the employer did not eliminate the position after his discharge.  Similarly, in O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996), Justice Scalia held that, as part of the prima facie case for an ADEA discriminatory discharge claim, a plaintiff need not show that the replacement employee was not of the protected class -- i.e. under forty-years old.  Id. at 312-13.  As Scalia explained:  "The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*."  Id. at 312.  Scalia concluded: "Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."  Id. at 313.  The Court notes that the decisions in the ADEA context -- O'Connor v. Consolidated Coin Caterers Corp. and Miller v. Eby Realty Group, L.L.C. -- are in harmony with the Title VII discrimination cases of English v. Colorado Department of Corrections and Kendrick v. Penske Transportation Services.  Under this Supreme Court and Tenth Circuit precedent, a plaintiff need not show that a member of a non-protected class replaced the plaintiff, but must show that she was "terminated under circumstances giving rise to an inference of discrimination."  Kendrick v. Penske Transp. Servs., 220 F.3d at 1227 n.5.  In the ADEA context, such an inference arises when a plaintiff shows that a younger person replaced his or her position; that younger person, however, need not be outside the protected class of younger than forty-years old.  Applying the discriminatory

### 3.     Prima Facie Case of Race and National Origin Discrimination.

In the discriminatory discharge context, to establish a prima facie case of unlawful discrimination on the basis of race or national origin in violation of Title VII, the plaintiff must demonstrate: "'(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge.'" English v. Colo. Dep't of Corr., 248 F.3d at 1008 (quoting Kendrick v. Penske Transp. Servs., 220 F.3d at 1229). By analogy, Gamez must show: (i) she is a member of a protected class; (ii) she was qualified for the job; (iii) she suffered an adverse employment action when Country Cottage reduced her hours; and (iv) her hours were allocated to other workers.

### 4.     Adverse Employment Actions Under Title VII and the ADEA.

Applying a liberal definition to the phrase "adverse employment action," the Tenth Circuit does not limit such actions to monetary losses.   Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998)(citing Berry v. Stevinson Chevrolet, 74 F.3d 980, 986-87 (10th Cir. 1996)).[23]

---

discharge under the ADEA cases to this case, therefore, the Court will apply the prima facie case set forth in Miller v. Eby Realty Group, L.L.C.

[23] Sanchez v. Denver Public Schools involved both a Title VII and an ADEA claim, but the Tenth Circuit, in its analysis of whether the alleged conduct constituted an adverse employment action, did not distinguish between Title VII and the ADEA.  See 164 F.3d at 531-32.  The Tenth Circuit, in Dirusso v. Aspen School District No. 1, No. 03-1334, 2004 WL 2898069 (10th Cir. Dec. 15, 2004)(unpublished decision), for the purposes of their analysis of a ADEA retaliation claim, "[a]ssum[ed], without deciding, that the Title VII standards for determining what is an adverse employment action should be used in ADEA cases . . . ."  Id. at *12.  See Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 n.2 (2d Cir. 2000)(noting that Title VII cases defining adverse actions are applicable in an ADEA case because "both the ADEA and Title VII prohibit discrimination with respect to the 'compensation, terms, conditions, or privileges of employment'")(quoting 29 U.S.C. § 623(a)(1); 42 U.S.C. § 2000e-2(a)(1)).  The Tenth Circuit has also relied on Title VII precedent in other cases when determining whether a particular alleged employment action was "adverse" for the purposes of an ADEA claim.  McCrary v. Aurora Pub. Schs., 57 Fed.Appx. 362, 368-369 (10th Cir. 2003)(unpublished decision).  In McCrary v. Aurora Public Schools, the Tenth Circuit relied on

Instead, the Tenth Circuit "takes a case-by-case approach, examining the unique factors relevant to the situation at hand."  Sanchez v. Denver Pub. Sch., 164 F.3d at 532 (internal quotations omitted)(citing Jeffries v. Kansas, 147 F.3d 1220, 1232 (10th Cir. 1998)).  The action, however, must be more than "'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action."  Sanchez v. Denver Pub. Schs., 164 F.3d at 532 (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)).  In Sanchez v. Denver Public Schools., the Tenth Circuit held that a teacher's transfer between schools within the same vicinity did not constitute an adverse employment action for purpose of Title VI discrimination liability.  Sanchez v. Denver Pub. Sch., 164 F.3d at 532.  In so holding, the Tenth Circuit noted that it was a purely lateral transfer in that her salary and benefits remained the same and that she continued to teach at the same level.  See id.

To be adverse, the action must "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998).  To constitute an adverse employment action, the conduct must be "'materially adverse' to the employee's job status."  Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1213 (2003)(quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 533).

## **ANALYSIS**

Under Tenth Circuit law, even though Gamez did not file a response to Silverstone's motion for summary judgment, Silverstone must still meet its burden of production under rule 56(c) and

---

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998), a Supreme Court case addressing adverse employment actions in the Title VII context, and Sanchez v. Denver Public Schools.  The Court will therefore apply Tenth Circuit precedent in the Title VII context to Gamez' ADEA claim.

demonstrate that no genuine issue of material fact exists.  The Court concludes that there is a genuine issue of material fact whether Silverstone can be held liable as a successor, but, because there is no genuine issue of material fact on the underlying age and race discrimination claims, the Court will grant Silverstone summary judgment on all federal claims.

## I.     THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER SILVERSTONE IS SUBJECT TO SUCCESSOR LIABILITY.

The Court must first analyze whether the doctrine of successor liability applies to both Gamez' ADEA claim and Title VII race discrimination claim.[24]   In Trujillo v. Longhorn Manufacturing Co., the Tenth Circuit applied successor liability in the employment discrimination context arising under Title VII.  In so holding, the Tenth Circuit noted that Title VII's  legislative history suggested that "courts use wide discretion in exercising equitable powers with the goal of fashioning the most complete relief possible."  694 F.2d at 225.

Although the Tenth Circuit has not yet applied successor liability in the ADEA context, Title VII and the ADEA are similar "both in their aims--the elimination of discrimination from the workplace--and in their substantive prohibitions.  In fact, the prohibitions of the ADEA were derived in haec verba from Title VII."  Lorillard v. Pons, 434 U.S. 575, 584 (1978).[25]  Because of the similarities in their broad remedial purposes, the Court will apply the successor liability doctrine to Gamez' ADEA claims.

---

[24] As the Court discusses in its analysis of the race and national origin discrimination claim, it is questionable whether such a claim was properly pled.  Because Gamez now proceeds pro se, and because the claim is in the EEOC Charge and the IPTR, the Court will consider the merits of a Title VII race and national origin discrimination claim.

[25] Title VII and the ADEA, however, are not without their differences.  See, e.g., Ellis v. United Airlines, 73 F.3d 999, 1009 (10th Cir. 1996)(holding that a plaintiff cannot bring a disparate impact claim under the ADEA).

In so concluding, the Court notes that Silverstone does not contest the application of the successor liability to Gamez' claims.  Instead, Silverstone contends that, under successor liability, it should not be held liable.  This concession is relevant not only to the ADEA claim, but also to the Court's consideration of the Operations Transfer Agreement, which is not a purchase of assets agreement as described in other cases.  Rather it appears to resemble an assignment and assumption of BNMHC's lease with Hobb's Associates.  Again, because Silverstone does not contest the application of the successor liability doctrine in this context, and the Court does not see any reason why it should not apply, the Court will now consider whether Silverstone can be held liable as a successor corporation.

In determining whether successor liability applies to Silverstone, the Court will consider the various MacMillan factors that the Tenth Circuit adopted in Trujillo v. Longhorn Manufacturing Co., 694 F.2d at 225.  Moreover, even though the Tenth Circuit has not adopted the refined three-factor test, the Court will apply it -- solely as a guide -- in its determination, but will still consider all of the factors that Trujillo v. Longhorn Manufacturing Co. outlined.

On the factor whether there was notice of the alleged unlawful employment action, Silverstone alleges that neither it, nor Peak Management, had any knowledge of Gamez' EEOC Charge.  See Schofield Aff. ¶ 5, at 2 ("On August 1, 2003, neither Silverstone, Peak Management, nor Peak Medical had knowledge of Gamez' charge against Country Cottage for discrimination or any potential claim that Plaintiff had against Country Cottage for breach of contract.").  Even though Gamez filed her EEOC Charge in May, 2003, there is no evidence in the record contradicting or challenging this allegation.

In regard to BNMHC's ability to pay, Silverstone contends that "there is no evidence in the

record to indicate BNMHC's inability to provide full relief to [Gamez] for her claims prior to its transfer of operations to Silverstone.  Unless [Gamez] can present some evidence of BNMHC's inability to pay, then she will fail to meet her summary judgment burden of responding with competent evidence showing a genuine issue of material fact."  Motion for Summary Judgment at 12-13 (citing Scott v. Sopris Imports Ltd., 962 F.2d at 1360; Fed. R. Civ. Pro. 56(e)).  Before the burden shifts to Gamez, however, Silverstone must meet its initial burden of demonstrating -- based on the "pleadings, depositions, interrogatories, and admissions on file, together with the affidavits, if any" -- that there is no genuine issue of material fact.  Silverstone has offered no evidence of BNMHC's financial condition, including, unlike Scott v. Sopris Imports Ltd., the amount Silverstone paid BNMHC to take over its lease.  The Court is aware that Gamez cannot rely on conclusory allegations that there is a genuine issue of material fact whether BNMHC has the ability to provide her relief.  Silverstone, however, must first provide sufficient evidence demonstrating there is no genuine issue of material fact.  Because Silverstone offers no evidence to support a conclusion that a genuine issue of material fact does not exist on BNMHC's ability to provide Gamez relief, it has not offered sufficient evidence on which the Court can reach a determination on successor liability on this basis.  On the issue of the ability of BNMHC's ability to provide adequate relief, the Court also notes that Gamez is seeking a mixture of legal and injunctive relief.  Most importantly, she is seeking in part an order requiring Country Cottage to provide her with a schedule comparable to a forty-hour workweek and eligibility for health benefits.[26]  Because BNMHC is no longer the operator

---

[26] The IPTR describes this as a "reinstatement to 40 hours per week."  IPTR at 3.  There is no evidence in the record, however, that Gamez ever worked forty hours a week.  The Court, therefore, declines to describe the relief sought as a "reinstatement."

of the facility, it would be unable to provide the injunctive relief sought.[27]

Although Courts have stressed the importance of the notice and the ability to the predecessor company to provide relief in determining whether to apply successor liability, the Court should also consider whether there was a substantial continuity in the business when Silverstone took over operations from BNMHC.  The evidence in the record suggests that, by assuming the lease, Silverstone took over what is most appropriately described as the exact function of BNMHC.  Although Silverstone did not provide the Court will many details on the mechanics of the transfer, the Operations Transfer Agreement contains a clause indicating that BNMHC "agrees to sell, transfer, and convey" to Silverstone "the inventory, supplies, consumables and foodstuffs . . . ."  Operations Transfer Agreement, Art. 2, § 2.2, at 1.  Moreover, according to Silverstone, numerous entities leased Country Cottage during Gamez' ten-year tenure before her hours were reduced in 2003.  In her deposition, Gamez testified that, when a "new company would come in, they would never give us new forms to fill out that they were rehiring us."  Gamez Depo. at 23:8-10.  Gamez also testified that the "company" -- which the Court will assume is Country Cottage -- "would just remain the same" and that "[t]he only difference was the checks."  Id. at 23:14-16.  This evidence is sufficient to create a genuine issue of material fact whether "there has been a substantial continuity of business operations."  Gamez also testified that her position and her duties never changed, see id.; id. at 49:12-13, suggesting that, after taking over the lease from BNMHC, Silverstone operated the same business, that being a nursing home.  Furthermore, Gamez' testimony that she has been working at Country Cottage since 1993, and when new companies would come in, only the checks would

---

[27] BNMHC would, however, be able to provide the relief sought in the alternative, which is the difference in her salary and that of a forty-an-hour week position until Gamez' "normal retirement age."

change, indicates both that Silverstone runs substantially the same business as BNMHC and that, during after the transfer from BNMHC, Silverstone used substantially the same work force.  Gamez also testified that Lozano worked at Country Cottage before Silverstone was the operator -- which suggests that Silverstone retained some of the supervisory personnel.  See Gamez Depo. at 15:19-21.

Silverstone contends that imposing successor liability would pose an undue hardship on the company, especially considering the Operations Transfer Agreement had a provision expressly stating that it did not assume BNMHC's liability.  Nevertheless, based on the evidence in the record, there is a genuine issue of material fact whether "there has been a sufficient continuity in the business operations of the predecessor and successor," and, accordingly, the Court will not grant summary judgment of the basis of successor liability.

## II.   GAMEZ' HAS OFFERED INSUFFICIENT EVIDENCE TO CREATE A GENUINE ISSUE OF MATERIAL FACT THAT SHE WAS UNLAWFULLY DISCRIMINATED AGAINST ON THE BASIS OF HER AGE, RACE OR HER NATIONAL ORIGIN.

Having decided that there is a genuine issue of material fact whether Silverstone can be held liable for an alleged discriminatory act while Gamez was an BNMHC employee, the Court must also consider whether there is a genuine issue of material fact that Country Cottage violated her federal statutory rights.  The Court concludes that there is no genuine issue of material fact on either claim and, therefore, will grant summary judgment in Silverstone's favor on all federal claims.

### A.   GAMEZ HAS NOT ESTABLISHED A PRIMA FACIE CASE OF AGE, RACE OR NATIONAL ORIGIN DISCRIMINATION.

#### 1.   Age discrimination.

To establish a prima facie case of unlawful age discrimination in violation of the ADEA, Gamez must show that (i) she is within the protected age group; (ii) she was doing satisfactory work;

(iii) the reduction of her work hours constituted an adverse employment action; and (iv) a younger person was assigned the hours by which her schedule was reduced.[28]  Gamez is over forty-years old, so she meets the first element of the prima facie case.  On the second, Silverstone concedes that she was qualified to be a housekeeper, see Motion for Summary Judgment at 15, and there is nothing in the record indicating she was not doing satisfactory work.  In her deposition, Gamez testified her 2003 annual evaluation performed by Lozano indicated that she was doing a good job.  See Gamez Depo. at 34:1-13.  Moreover, Silverstone also concedes that the reduction of her work hours constituted an adverse employment action.  See Motion for Summary Judgment at 15; Transcript of Hearing at 6:5-8.  The Court finds that a reduction of hours from twenty-eight to twenty-four per week is an adverse employment action because it "constitutes a significant change in employment status."  Burlington Indus. v. Ellerth, 524 U.S. at 761.

On the fourth element, however, there is no evidence that Country Cottage allocated the hours by which Gamez' schedule was reduced to any other workers, including younger employees.  To the contrary, White and Lozano stated in their affidavits that Country Cottage did not allocate the hours to other workers or departments, and that Country Cottage did not hire other employees to work the hours by which Country Cottage reduced her schedule.  Moreover, the record does not contain circumstantial evidence indicating that Country Cottage treated Gamez less favorably than other younger employees.  Silverstone offered evidence that all of the housekeeper hours -- not just

---

[28] The Court notes that, in reduction in force ("RIF") cases, the Tenth Circuit has held that the fourth prong of the prima facie case is "that there is some evidence the employer intended to discriminate against her in reaching its RIF decision.  The fourth element may be established through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the RIF."  Beaird v. Seagate Technology, Inc., 145 F.3d 1159, 1165 (10th Cir. 1998)(quotation and citations omitted).  These cases may be analogized to Gamez' situation, in which management allegedly discriminated against her on the basis of her age when it reduced her hours.

Gamez' -- were reduced in February, 2003.  There is insufficient evidence to establish a genuine issue of material fact on the fourth element of the prima facie case.  Thus, Silverstone is entitled to summary judgment on the ADEA discrimination claim.

        2.        **National Origin and Race Discrimination.**

In her Complaint, Gamez does not allege a violation of Title VII.  In her EEOC Charge, however, Gamez indicates that she believes she was discriminated against on the basis of her national origin as well.  In addition, her IPTR expressed an intent to file a first amended complaint, and listed as an exception that Gamez believes she was discriminated against because she is Hispanic.  Gamez, however, did not file an amended complaint.  Gamez now proceeds *pro se*, and, to give the pleadings the broadest reading as possible, the Court will address the national origin and race claim.

To meet her burden of a prima facie case of race or national origin discrimination in violation of Title VII, Gamez must establish a genuine issue of material fact that: (i) she is a member of a protected class; (ii) she was qualified for the job; (iii) she suffered an adverse employment action when Silverston reduced her hours; and (iv) her hours were allocated to other workers.  Gamez is Hispanic and is originally from Mexico, so she meets the first element of the prima facie case.  Gamez also meets the second and third element for the same reasons discussed with the prima facie case of age discrimination.  There is not sufficient evidence, however, to create a genuine issue of material fact on the fourth element.  The evidence in the record indicates that Country Cottage did not assign those hours to any other worker and no additional employees were hired to assume Gamez' lost hours.  Because the reduced hours were "eliminated," Gamez does not create a genuine issue of material fact whether she was discriminated against on the basis of her national origin or race.

**B.   EVEN ASSUMING GAMEZ MET HER BURDEN OF ESTABLISHING A PRIMA FACIE CASE OF AGE, RACE AND/OR NATIONAL ORIGIN DISCRIMINATION, SILVERSTONE OFFERED A LEGITIMATE, NONDISCRIMINATORY REASON FOR THE REDUCTION IN HER HOURS.**

Assuming Gamez established a prima facie case on age, race and/or national origin discrimination, Silverstone has offered a legitimate, nondiscriminatory reason for the reduction of her hours.  In January, 2003, the number of patients at Country Cottage dropped, causing revenues to decline.  In response to the decreased revenue, Country Cottage was forced to reduce its expenses, including those incurred by the maintenance department.  For this reason, Country Cottage reduced Gamez' hours from an average of twenty-eight hours per week to an average of twenty-four hours per week.  Lozano informed Gamez for the reason of the reduction in her work hours.  Thus, Country Cottage reduced Gamez' hours based on the legitimate, nondiscriminatory business decision to cut costs.  Having establishing a legitimate, nondiscriminatory reason, the burden shifts back to Gamez to establish that the reason is pretext.

Silverstone states that Gamez was not entitled to health insurance benefits because she did not work the requisite number of hours.  The Ballantrae health plan in the record, however, was effective March 1, 2003, so it is not clear which health plan was in effect at the time her hours were reduced, and whether she would have been eligible for such benefits before March 1, 2003.  In any case, Silverstone has stated legitimate, nondiscriminatory reasons for its action.

**C.   THERE IS INSUFFICIENT EVIDENCE IN THE RECORD TO ESTABLISH A GENUINE ISSUE OF MATERIAL FACT THAT SILVERSTONE'S LEGITIMATE, NONDISCRIMINATORY REASON IS PRETEXT.**

To establish that Silverstone's proferred reason is pretext, Gamez has the burden of showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d at 1263 (quotation omitted).

Gamez conceded that Lozano sets her schedule, and that he is not prejudiced against Hispanics or older employees. Moreover, in her deposition, Gamez conceded that she has no evidence that Country Cottage reduced her hours because of her age. See Gamez Depo. at 42:6. Based on this testimony, Gamez demonstrates that she does not harbor even the subjective belief that she was discriminated against on the basis of her age.

In her deposition, however, Gamez asserted that Country Cottage reduced her hours because of her language and national origin. See id. 41:25 - 42:2. To support this allegation, Gamez discussed two incidents in which Tammy spoke to her in a derogatory manner. These incidents occured one to three years before Country Cottage reduced Gamez' hours. Gamez even conceded that Tammy no longer worked at Country Cottage at the time her hours were reduced. There is no evidence in the record establishing a causal connection between the alleged derogatory comments and the reduction of her hours. See Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209-10 (10th Cir. 1999)(recognizing that derogatory "comments may serve as circumstantial evidence of discrimination, [but] the plaintiff must still show some nexus between the statements and the defendant's decision to terminate the employee")(citation omitted), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90, 98-102 (2003). "'Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions.'" Rea v. Martin Marietta Corp., 29 F.3d 1450, 1457 (10th Cir. 1994)(quoting Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir.1994)). Even assuming these two incidents occurred, it is not sufficient to create a

-34-

genuine issue of material fact that Country Cottage's legitimate nondiscriminatory reason is pretext.

Silverstone also contends that there is also no evidence in the record that Country Cottage acted contrary to a written company policy by reducing her hours. To support this allegation, Silverstone offers its employee Handbook, which explicitly provides that it is not intended to guarantee any specific terms of employment and that managers do not have the authority to make promises regarding employment. Silverstone's employee handbook, however, was not effective until September 1, 2003. Silverstone does not offer evidence to demonstrate what written policies BNMHC had in place when it reduced Gamez' hours. While the absence of this evidence does not create a genuine issue of material fact on pretext, the evidence of Silverstone's Handbook does not support a finding that Country Cottage did not act contrary to a written policy in effect at the time the adverse action occurred.

There is also insufficient evidence to create a genuine issue of material fact that Country Cottage acted contrary to any unwritten policy. "A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." Kendrick v. Penske Transp. Servs., 220 F.3d at 1230. "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline." Id. at 1232 (quotation omitted). Silverstone offered evidence that Lozano was Gamez' supervisor, and that he was responsible for the housekeepers' schedules. Lozano, in his affidavit, stated that all of the housekeepers worked the same hours and, in February, 2003, each of the housekeeper's schedules were reduced the same

amount.[29]  Thus, there is insufficient evidence to demonstrate that Country Cottage treated Gamez differently from other housekeepers.  Gamez, therefore, has not established a genuine issue of material fact whether Country Cottage treated similarly situated employees differently to establish pretext.[30]

In her Complaint, Gamez alleges "that her hours were reduced from 7.5 hours to 5.0 hours per day, making her ineligible for medical benefits."  To create a genuine issue of material fact on pretext, Gamez could offer evidence to demonstrate that legitimate, nondiscriminatory reason that her hours were reduced -- to decrease payroll expenses -- is not worthy of belief because the reduction in her hours made her ineligible for health insurance.  Gamez' deposition, the payroll records, White's affidavit, and Lozano's affidavit, however, all indicate that Gamez' hours were reduced from six hours per day to five hours per day.  There is no evidence in the record that -- in January and February of 2003 -- Gamez, when working an average of twenty-eight hours per week, would have been eligible for health insurance.  Because there is no evidence in the record to indicate the Gamez was entitled to health insurance benefits before her hours were reduced, Gamez has not offered competent evidence to create a genuine issue of material fact that the legitimate, nondiscriminatory reason for reducing her hours is pretext for denying her health care benefits.

---

[29] There is no evidence in the record indicating how many hours Country Cottage reduced from employees' schedules in other departments.  Because all of the housekeepers had the same supervisor, however, it is the other housekeepers to whom Gamez should compare herself to demonstrate she was treated differently than other employees.

[30] Gamez has not offered evidence of pretext based on disparate treatment of similarly situated employees even if the comparable group is that of all of maintenance and not just the other housekeepers.  There is no evidence in the record to create a genuine issue of material fact that she was similarly situated to other employees in the maintenance department (other than the housekeepers), and that the other maintenance employees were treated differently than she was.

The record does not have sufficient evidence from which Gamez can create a genuine issue of material fact whether Country Cottage's decision to reduce her hours is pretext for age, race, or national origin discrimination.  The Court will therefore grant Silverstone summary judgment on Gamez' age, race, and national origin discrimination claims.

Silverstone is entitled, therefore, to summary judgment on all federal claims.  Having dismissed all claims on which the Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c).  Gamez is now proceeding *pro se* and originally brought her claims in state court.  The Court therefore remands all remaining claims -- all of which sound in state law -- to state court.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 357 (1988)(recognizing that, when "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims" and concluding that "a district court has discretion to remand to state court a removed case involving pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate").

**IT IS ORDERED** that the Defendant Silverstone Healthcare of Hobbs, L.L.C. d/b/a Country Cottage Care and Rehab.'s Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment is granted on all federal claims and all federal claims are **DISMISSED with prejudice**.  All remaining state law claims are remanded to the Fifth Judicial District, County of Lea, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE


Maria R. Gamez
Hobbs, New Mexico

     *Plaintiff pro se*

Duane C. Gilkey
Carol Dominguez Shay
Gilkey and Stephenson, P.A.
Albuquerque, New Mexico

     *Attorneys for the Defendant*

-38-